IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KENTES WEST,

      Plaintiff,      )
                          )
vs.                        )   Case No. 14-cv-788-MJR-SCW
                          )
MICHAEL ATCHISON, CEDRIC  )
McDONNOUGH, AARON HOOD, C/O  )
ULEN, MAYNARD HUDSON, MICHAEL  )
BAKER, LINDA WHITESIDE, ANGELA  )
GROTT, KIMIBERLY BUTLER, and  )
Unknown Defendants,

      Defendants.

## MEMORANDUM AND ORDER

**WILLIAMS, Magistrate Judge:**

### INTRODUCTION

This case is before the Court on a motion for summary judgment for Plaintiff's failure to exhaust administrative remedies (Docs. 51 and 52) filed by Defendant Linda Whiteside and a motion for summary judgment on the issue of exhaustion of administrative remedies (Docs. 54 and 55) filed by Defendants Michael Atchison, Kimberly Butler, Cedric McDonnough, Aaron Hood, Michael Baker, Angela Grott,[1] and Maynard Hudson. The matter has been referred to United States Magistrate Judge Stephen C. Williams by United States District Judge Michael J. Reagan pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (c), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1(a). It is **RECOMMENDED** that the District Court **ADOPT** the following findings of fact and conclusions of law, **GRANT** Defendant Whiteside's motion for summary judgment and **DENY** the motion for summary judgment filed by Atchison, Butler, McDonnough, Hood, Baker, Grott, and Hudson.

---

[1] Although referred to Grogg in his complaint, defendant has identified her proper name as Angela Grott. Thus, the Clerk is directed to make the proper change on the docket.

**FINDINGS OF FACT**

A. **Procedural Background**

Plaintiff, an inmate currently incarcerated at Menard Correctional Center, filed this 42 U.S.C. § 1983 complaint against several defendants for failing to protect him from two attacks by other inmates and for failing to provide him pain medication for his injuries (Doc. 1).

As narrowed by the Court's threshold order (Doc. 7), Plaintiff's complaint alleges that from April 17, 2012 to June 2012 he made repeated verbal and written requests to Menard officials for protection from other inmates (Doc. 7, p. 1). Plaintiff indicated that he had been threatened by members of the Latin Folks gang (*Id.*). He wrote to Defendant Atchison, who was warden at the time, and Defendant Whiteside, Menard's mental health director, for protection on April 17, 2012 (*Id.*).

On April 25, 2012 he was moved to East cell house where Plaintiff alleges the threats against him were even greater. He requested protective custody from Defendant McDonnough on May 9, 2012. McDonnough returned with two other officers who handcuffed Plaintiff and took him to North 2 wing. Plaintiff was then taken to segregation on the basis that he was refusing housing. He was written a disciplinary ticket for disobeying an order to lock up (Doc. 7, p. 2).

Once in segregation, Plaintiff requested to speak with internal affairs officers. Defendants Hood, Baker, and Ulen ignored these requests even though Plaintiff alleges that he explained about his fear of being attacked (Doc. 7, p. 2). Ulen eventually told him that Internal Affairs would come and speak with Plaintiff but they did not meet with him until May 12, 2012 (*Id.* at p. 3). On May 15, 2012, Plaintiff sent an emergency grievance to Defendant Atchison about his fear of imminent harm. He saw Defendant Hudson, an internal affairs officer, in passing and explained his concerns and asked for

a single-man cell in segregation (*Id.*). Defendant Hudson said he would look into the matter (*Id.*). On May 16, 2012, Plaintiff spoke with Defendant Whiteside about his safety concerns (*Id.*).

On May 22, 2012, he was moved to a different segregation cell and was housed with an inmate Martinez who he believed was part of the Latin Folks gang (Doc. 7, p. 3). Plaintiff lied to Martinez about his name when he found out Martinez was in the gang. He also declined out of cell recreation in order to avoid being noticed. Sometime in June, 2012, Plaintiff learned that another Latin Folks member, Smoky, was housed near him (*Id.*). He told Defendant Hudson about his fears of this member (*Id.*).

On July 2, 2012, Plaintiff was attacked by Martinez in their cell with a fan (Doc. 7, p. 4). Plaintiff did not fight back. He was taken to the health care unit, but an unknown health care unit employee failed to give him pain medication (*Id.*). On July 4, 2012, he wrote to Whiteside asking to move up an appointment with her so he could talk about the assault. He also wrote another emergency grievance to Atchison and sent a copy to Defendant Grott about the assault (*Id.*). He complained that his pleas for protection were ignored. On July 17, 2012, while outside, Plaintiff was assaulted by Smoky, the other Latin Folks member that had been housed near him (*Id.*). That member, as well as another gang member, punched him in the head. Plaintiff was again taken to the health care unit with an eye injury, headache, bruises, and minor bleeding. Again he was not given pain medication (*Id.*). Plaintiff's complaint alleges that Defendants Atchison, Whiteside, McDonnough, Hood, Ulen, Hudson, Baker, and Defendant Grott failed to protect Plaintiff from the assault (Count 1) and that unknown health care unit officials failed to provide pain medication following the assault (Count 2). Warden Kimberly Butler was added as a defendant in order to identify the unknown defendants (Doc. 7, p. 8).

In response to Plaintiff's complaint, Defendants Whiteside (Doc. 52), and Defendants Atchison,

Butler, McDonnough, Hood, Baker, Grott, and Hudson (Doc. 55) filed summary judgment motions arguing that Plaintiff failed to exhaust his administrative remedies. Defendants point out that there are no grievances from Plaintiff in either the ARB, grievance log records at Menard, or Plaintiff's master file related to an assault or Defendants' failure to protect him from an assault (Doc. 55-1, 55-2, 55-3, 55-4).

### B. Pavey Hearing

As the undersigned found there to be a dispute of fact over whether Plaintiff properly exhausted his administrative remedies, the Court held a hearing on July 9, 2015 pursuant to *Pavey v. Conley*, **544 F.3d 739, 740-41(7th Cir. 2008).** The undersigned noted at that hearing that Plaintiff argued that he filed an emergency grievance in May related to his complaints to Warden Atchison about his safety and that he filed another grievance on July 10 (Doc. 50) related to his request for protection and the assault which occurred on July 2. Plaintiff also alleges that he filed grievances while at Pontiac Correctional Center.

#### 1. *Plaintiff's testimony*

Plaintiff first testified about his grievances. Plaintiff testified that he wrote a grievance on May 15, 2012 while he was in segregation. It was an emergency grievance which would have been addressed to Warden Atchison and since Plaintiff was in segregation he had to submit the grievance in the mail because he could not leave his cell.

He also testified that he talked with his counselor on June 10, 2012 and inquired at that time about the May 15, 2012 grievance. While he did not recall meeting with his counselor on June 6, 2012, as is indicated in the cumulative counseling summary (Doc. 52-5, p. 6), if he did meet with her he would have asked about the status of his grievance.

Plaintiff was assaulted on July 2, 2012. After the assault, on July 10, 2012, Plaintiff testified

that he filed an emergency grievance again through the prison mail system (Doc. 50, p. 20-21). He also believes that he submitted a copy of the grievance to someone with the Americans with Disabilities Act. Someone gave him an address for the organization and he sent it there as well.

Plaintiff testified that he was again assaulted on July 18, 2012 and the next day he was sent to Pontiac Correctional Center. While at Pontiac, Plaintiff testified that he filed three more grievances and that Pontiac told him he would have to send his grievances regarding events at Menard directly to the ARB. He submitted a grievance on August 10, 2012 about grievances he still had pending at Menard. He was informed that Pontiac did not have jurisdiction over those grievances so he sent his grievance to the ARB. He sent another grievance directly to the ARB on September 12, 2012 regarding the July 17, 2012 assault (Doc. 58-2, pp. 25-30). He testified that he did not receive a response. At his protective custody hearing with the ARB on December 13, 2013, he mentioned his grievance to the chairperson and she told him that she would respond to that grievance when ruling on his protective custody request (Doc. 52-3, p. 7).

Plaintiff testified that he did not include Defendant Whiteside in his May 15, 2012 grievance or any of the other grievances that he wrote. Plaintiff stated that he did not have an issue with Whiteside and he would not have grieved anything against her. He might have mentioned her in a grievance as someone he talked to but he did not write a grievance against her.

### 2. *Robin Rowold*

Robin Rowold also testified about Plaintiff's grievances. She is a correctional counselor at Menard Correctional Center. Rowold testified that counselors keep track of all of their contacts with inmates through their cumulative counseling summary (Doc. 52-5). Rowold noted that on June 6, 2012, according to the cumulative counseling summary, she saw Plaintiff in his cell and provided him with a transaction statement. Rowold stated that there was no indication that Plaintiff inquired about

his grievances being lost and she would have included his inquiry on the summary if they had discussed the issue (Doc. 52-5, p. 6). Rowold also testified that on June 14, 2012, there is an entry that Plaintiff requested grievances which were sent to him (*Id.*). Rowold believes that this meant that Plaintiff sought blank grievances. Rowold indicated that she received a grievance from Plaintiff on June 19, 2012 regarding his mail and she responded that the mail was working as fast as possible (*Id.*). On June 22, 2012, Angela Grott met with Plaintiff and discussed grievances and audio/visual. She also provided Plaintiff with two more blank grievances (*Id.*).

Rowold also reviewed the grievance logs (Defendant's Exhibit 5) and emergency grievance logs (Defendant's Exhibit 6) from 2012. There were no emergency grievances on the log from Plaintiff in May. Rowold noted that eight grievances were logged on the emergency grievance log for May 15, 2012, but none of the grievances were from Plaintiff. Similarly, there were no emergency grievances from Plaintiff on the log in July. There are also no grievances from Plaintiff on the May or July grievance logs.

Rowold noted that while Plaintiff had a grievance regarding mail that was returned to him by his counselor on June 19, 2012, that grievance was not logged on the grievance log. Rowold testified that the grievance would only be logged on the grievance log if he forwarded the grievance he received back from his counselor to the grievance officer. If he did not appeal the grievance to the grievance officer, then it would not be logged.

### 3. *Crystal Chalkey*

Chrystal Chalkey also testified at the hearing. She is currently employed at Pontiac Correctional Center in the mailroom. She logs mail that is incoming and outgoing. Chalkey noted that when an inmate sends mail that requires extra postage then it is logged and the extra postage is deducted from the inmate's trust fund account. Chalkey noted that on August 23, 2012, Plaintiff's

trust fund account was deducted 20 cents for legal postage (Defendant's Exhibit 2). There were no other entries on Plaintiff's trust fund account for legal postage, but money would only be deducted for extra postage. If an inmate used a pre-stamped envelope that did not require extra postage it would not appear on the trust fund transaction statement. Thus, Chalkey testified that Plaintiff could have sent mail that was not logged on his trust fund transaction statement if it had the correct postage. However, all legal mail does get logged, when it is sent out, on a legal mail card log. The Court was not provided a copy of this log and thus directed the Defendants to supplement the records with the log.

### 4. *Legal Mail Card*

After the hearing, Defendants supplemented the record with the legal mail card which the undersigned ordered produced at the hearing. The log indicates that Plaintiff sent legal mail to the ARB on September 11, 2012, November 19, 2012, and December 14, 2012 while at Pontiac Correctional Center (Doc. 69).

### CONCLUSIONS OF LAW

**A. Summary Judgment Standard**

Summary Judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that [Defendants are] entitled to judgment as a matter of law." *Wragg v. Village of Thornton*, **604 F.3d 464, 467 (7th Cir. 2010).** Lawsuits filed by inmates are governed by the provisions of the Prison Litigation Reform Act ("PLRA"). **42 U.S.C. §1997e(a).** That statute states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* **(emphasis added).** The Seventh Circuit requires strict adherence to the PLRA's

exhaustion requirement. *Dole v. Chandler*, **438 F.3d 804, 809 (7th Cir. 2006) (noting that '[t]his circuit has taken a strict compliance approach to exhaustion").** Exhaustion must occur before the suit is filed. *Ford v. Johnson*, **362 F.3d 395, 398 (7th Cir. 2004).** Plaintiff cannot file suit and then exhaust his administrative remedies while the suit is pending. *Id.* Moreover, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison administrative rules require." *Pozo v. McCaughtry*, **286 F.3d 1022, 1025 (7th Cir. 2005).** Consequently, if a prisoner fails to properly utilize a prison's grievance process, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Dole*, **438 F.3d at 809.**

Under *Pavey*, the Seventh Circuit held that "debatable factual issues relating to the defense of failure to exhaust administrative remedies" are not required to be decided by a jury but are to be determined by the judge. *Pavey v. Conley*, **544 F.3d 739, 740-41(7th Cir. 2008).** Thus, where failure to exhaust administrative remedies is raised as an affirmative defense, the Court set forth the following recommendations:

> The sequence to be followed in a case in which exhaustion is contested is therefore as follows: (1) The district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate. (2) If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies, and so he must go back and exhaust; (b) or, although he has no unexhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust (provided that there exist remedies that he will be permitted by the prison authorities to exhaust, so that he's not just being given a runaround); or (c) the failure to exhaust was the prisoner's fault, in which event the case is over. (3)If and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits; and if there is a jury trial, the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the district judge in determining that the prisoner had exhausted his administrative remedies.

*Id.* at 742.

### B. Exhaustion Requirements under Illinois Law

As an inmate confined within the Illinois Department of Corrections, Plaintiff was required to follow the regulations contained in the Illinois Department of Correction's Grievance Procedures for Offenders ("grievance procedures") to properly exhaust his claims. **20 Ill. Administrative Code §504.800** *et seq.* The grievance procedures first require inmates to speak with the counselor about their complaint. **20 Ill. Admin. Code §504.810(a).** Then, if the counselor does not resolve the issue, the inmate must file a grievance form directed to the Grievance Officer within 60 days of the incident. *Id.* The grievance form must:

> contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is subject of or who is otherwise involved in the complaint. The provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

**20 Ill. Admin. Code §504.810(a)(b).** "The Grievance Officer shall [then] consider the grievance and report his or her findings and recommendations in writing to the Chief Administrative Officer...[who]shall advise the offender of the decision in writing within 2 months after receipt of the written grievance, where reasonably feasible under the circumstances." **20 Ill. Admin. Code §504.830(d).** If the inmate is not satisfied with the Chief Administrative Officer's response, he or she can file an appeal with the Director through the Administrative Review Board ("ARB"). The grievance procedures specifically state, "[i]f after receiving the response of the Chief Administrative Officer, the offender still feels that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director within 30 days after the date of the decision. Copies of the Grievance Officer's report and the Chief Administrative Officer's decision should be attached." **20 Ill. Admin. Code §504.850(a).** "The Administrative Review Board shall

submit to the Director a written report of its findings and recommendations." **20 Ill. Admin. Code §504.850(e).** "The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within 6 months after receipt of the appealed grievance, where reasonably feasible under the circumstances. The offender shall be sent a copy of the Director's decision." **20 Ill. Admin. Code §504.850(f).**

The grievance procedures do allow for an inmate to file an emergency grievance. In order to file an emergency grievance, the inmate must forward the grievance directly to the Chief Administrative Officer ("CAO") who may "[determine] that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender" and thus the grievance should be handled on an emergency basis. **20 Ill. Admin. Code §504.840(a).** If an inmate forwards the grievance to the CAO as an emergency grievance, then the CAO "shall expedite processing of the grievance and respond to the offender" indicating to him which course he has decided is necessary after reading the grievance. **20 Ill. Admin. Code §504.840(b).** Once the CAO has informed the inmate of his decision, the inmate may then appeal that decision to the ARB on an expedited basis. **20 Ill. Admin. Code §504.850(g).**

### C. Linda Whiteside

At the evidentiary hearing, Plaintiff testified that he never wrote any grievances against Linda Whiteside and that he did not have any issues with Whiteside. Plaintiff testified that Whiteside was the only one that listened to him about his concerns because she was his psychologist. Plaintiff stated that while he might have mentioned Whiteside in his grievances as a person he talked to, he did not grieve any issues about Whiteside in any of the grievances he testified that he filed. Thus, as Plaintiff concedes that he did not write any grievances against Whiteside, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** as to Whiteside.

### D. IDOC Defendants

However, as to the other Defendants, Michael Atchison, Cedric McDonnough, Aaron Hood, Michael Baker, Angela Grott, and Maynard Hudson, there is evidence in the record indicating that Plaintiff filed a grievance regarding their failure to offer Plaintiff protection. Plaintiff testified that he filed emergency grievances on May 15, 2012 and July 10, 2012. However, as to the May 15, 2012 grievance there is no evidence in the record that Plaintiff filed this grievance. He does not have a copy of the grievance and neither the grievance log nor the emergency grievance log indicates that any grievance was received from Plaintiff in May (Defendant's Exhibit 5 and Defendant's Exhibit 6). In fact, the emergency grievance log indicates that the warden received eight grievances from other inmates on May 15, 2012 but none of those were from Plaintiff (Defendant's Exhibit 6). There is no indication that grievances were not being received by the warden as he received several grievances from inmates both on that date and on May 10, 2012 and May 18, 2012. So there is evidence that the warden was receiving emergency grievances, but none from Plaintiff. Nor is there any evidence that Plaintiff inquired about these grievances with his counselor. There are several entries on the cumulative counseling summary where Plaintiff met with his counselor but none of those indicate that he asked about a missing emergency grievance (Doc. 52-5, p. 6). Plaintiff has provided a letter he allegedly submitted to the warden regarding the status of his May 15, 2012 grievance but there is no indication when he sent that letter, although presumably it was sometime in July as he mentions the July 2, 2012 incident with his cellmate (Doc. 58-2, p. 1). Further, Plaintiff does not include the grievance with the letter. Thus, there is no indication that a May 15, 2012 grievance even existed, let alone evidence that Plaintiff submitted it to the warden for review.

Similarly, there is no evidence that Plaintiff tried to exhaust his July 10, 2012 grievance. Plaintiff did include a copy of the grievance in his response to Defendants' Answer (Doc. 50, p. 20) but

there is no evidence that he submitted this grievance either. Plaintiff marked the grievance as an emergency, but the logs do not indicate that a grievance was received even though numerous other grievances were received from other inmates on July 10, 2012 and the surrounding dates (Defendant's Exhibit 6). However, there is no evidence that Plaintiff submitted his July 10, 2012 grievance for review.

Plaintiff also testified at the evidentiary hearing that he submitted a grievance directly to the ARB in September, once he transferred to Pontiac, about his requests for protective custody at Menard Correctional Center and the assaults that he experienced there. Plaintiff testified that a protective custody hearing was held at the ARB in December and he was told that his September grievance would be responded to with the ARB's decision on protective custody. Plaintiff never received a response from the ARB on the grievance.

Unlike the other two grievances, there is evidence that Plaintiff sought to submit a grievance to the ARB. Plaintiff has provided the Court with a grievance dated September 12, 2012 which describes Plaintiff's various attempts to warn all of the Defendants about his security concerns at Menard (Doc. 58-2, pp. 25-30). Plaintiff testified that he submitted the grievance directly to the ARB as is allowed by the grievance procedure. The grievance procedure directs an inmate to send a grievance directly to the ARB when it pertains to protective custody placement and issues that pertain to a facility other than the facility where an inmate is currently housed. **20 Ill.Admin.Code § 504.810(a).** As Plaintiff had transferred from Menard and was at Pontiac Correctional Center at the time, he was correct in submitting his grievance regarding the events at Menard directly to the ARB.

Defendants argued at the evidentiary hearing that there was no evidence that Plaintiff submitted a grievance to the ARB. They pointed to Plaintiff's trust fund transaction statement (Defendant's Exhibit 2) to show that no legal postage was distributed for Plaintiff in September 2012.

The only legal postage disbursement was for August 23, 2012. Mailroom employee Crystal Chalkey testified, however, that legal mail would not be documented on the inmate transaction statement if it had proper postage, as only items that needed additional postage would be noted on the transaction statement. She did note, however, that all outgoing legal mail to the ARB was documented on a legal mail card log.

The Court requested the card log be produced and Defendants subsequently produced the card log after the hearing (Doc. 69). The log shows that legal mail was sent from Plaintiff to the ARB on September 11, 2012 (*Id.*). Although Plaintiff's grievance is dated September 12, 2012, the undersigned finds that the grievance on the mail card log is likely the September 12, 2012 grievance as no other grievances were alleged to have been sent in September. Most likely Plaintiff simply misdated his grievance. Thus, the undersigned finds the evidence and Plaintiff's testimony consistent that he sent a grievance to the ARB regarding his July 17, 2012 assault and attempts to seek protection prior to that assault in September to the ARB. While there is no record of the ARB receiving the grievance, Plaintiff testified that he was informed at his protective custody hearing on December 13, 2012 that his grievance would be responded to with the ARB's decision on protective custody. A protective custody hearing did, in fact, take place on the stated date (Doc. 52-3) although there is no indication in the conference notes that Plaintiff's grievance was discussed.

Although the ARB did not respond to the September grievance, the undersigned finds Plaintiff's testimony that he submitted the grievance to the ARB to be credible. Plaintiff has provided a copy of the grievance and the mail card log indicates that a grievance was submitted to the ARB around that same time. Thus, the undersigned finds that once Plaintiff submitted his grievance to the ARB, he did all that he could to exhaust his administrative remedies. That the ARB ultimately did not respond to the grievance does not prevent Plaintiff's grievance from being deemed properly

exhausting. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (a remedy can be unavailable to a prisoner if the prison does not respond to the grievance or uses misconduct to prevent a prisoner from exhausting his resources); *Brown v. Darnold*, 2010 WL 3702373, at *3 (S.D. Ill. 2010) ("The Seventh Circuit has held that administrative remedies become 'unavailable' when prison officials fail to respond to inmate grievances." (quoting *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002)). Plaintiff properly submitted his grievance to the ARB and, at that point, did all that was necessary to exhaust his administrative remedies. Accordingly, the undersigned **RECOMMENDS** that the Court find that Plaintiff did all he could to exhaust his administrative remedies and **DENY** Defendants' motion for summary judgment.

### CONCLUSION AND RECOMMENDATION

Accordingly, it is **RECOMMENDED** that the Court **FIND** that Plaintiff did not exhaust his administrative remedies as to Linda Whiteside and **GRANT** her motion for summary judgment (Docs. 51 and 52), but **FIND** that Plaintiff exhausted his administrative remedies as to Defendants Atchison, McDonnough, Hood, Baker, Grott, and Hudson and **DENY** their motion for summary judgment (Docs. 54 and 55).[2]

Should the Court adopt this Report and Recommendation, the claims which remain in this case include:

(1) Plaintiff's Eighth Amendment failure to protect claim against Michael Atchison, Cedric McDonnough, Aaron Hood, C/O Ulen, Michael Baker, Angela Grott, and Maynard Hudson.

(2) Plaintiff's Eighth Amendment deliberate indifference claim against unknown defendant

---

[2] Although Defendant Butler also joined in the motion for summary judgment, the Court notes that she was only named as a party to this case for purposes of identifying John Doe defendants (Doc. 7, p. 8). Thus, Plaintiff did not need to exhaust any administrative remedies as to Butler and she remains in the case for purposes of identifying proper defendants only.

health care officials who failed to treat Plaintiff on July 2 and July 17, 2012.

Defendant Kimberly Butler also remains in the case for purposes of identifying unknown defendants.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *See, e.g., Snyder v. Nolen*, **380 F.3d 279, 284 (7th Cir. 2004).** Accordingly, Objections to this Report and Recommendation must be filed on or before **August 10, 2015.**

**IT IS SO ORDERED**.
DATED: July 22, 2015.

*/s/ Stephen C. Williams*
STEPHEN C. WILLIAMS
United States Magistrate Judge